# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| GREAT AMERICAN INSURANCE COMPANY, as Subrogee and Assignee of EGAN MARINE CORPORATION, and GULF COAST MARINE, LLC, AS AGENT FOR NORTHERN ASSURANCE COMPANY OF AMERICA AND MARKEL AMERICA INSURANCE COMPANY, as Subrogee and Assignee of EGAN MARINE CORPORATION, | |
| Plaintiffs, | No. 12 C 9718 |
| v. | Judge Robert M. Dow, Jr. |
| | Magistrate Judge Finnegan |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Great American Insurance Company ("GAIC"), Gulf Coast Marine, LLC, as Agent for Northern Assurance Company of America and Markel America Insurance Company ("Gulf Coast"), as Subrogees and Assignees of Egan Marine Corporation, filed this action seeking judicial review of the decision by the National Pollution Funds Center ("NPFC") to deny their claims under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701 *et seq.*, for reimbursement of oil removal costs following a barge explosion on January 19, 2005. Currently before the Court is Plaintiffs' motion to compel completion of the administrative record. For the reasons set forth here, the motion is denied.

**BACKGROUND**

Dennis H. Egan serves as president and sole shareholder of Egan Marine Corporation ("EMC"), which at all relevant times owned and operated the tank barge EMC 423 and the Motor Vessel ("M/V") LISA E. (Cmplt. ¶¶ 4, 13). On January 19, 2005, the M/V LISA E was towing the EMC 423 as it was transporting clarified slurry oil on the Chicago Sanitary and Ship Canal. (*Id.* ¶¶ 9, 10, 13, 20). At approximately 4:30 p.m., there was an explosion aboard the EMC 423 that caused a fire on the barge and ultimately resulted in the discharge of oil into the Canal. (*Id.* ¶¶ 20, 21). The United States Coast Guard coordinated clean-up and removal operations at the explosion site, with Service Welding and Shipbuilding, LLC ("SWS"), a limited liability company owned by Mr. Egan, serving as the primary removal contractor. (*Id.* ¶¶ 7, 26, 27). As insurers of EMC, Plaintiffs GAIC and Gulf Coast paid more than $8.6 million in costs associated with the removal effort. (*Id.* ¶¶ 5, 6, 26, 34). The United States of America, directly and as subrogee to claimants to the OPA's Oil Spill Liability Trust Fund ("the Fund"), also incurred removal costs as a result of this incident. As discussed in more detail below, EMC, SWS and Plaintiffs sought to recover their removal costs from the Fund through administrative claims to the NPFC initiated in January 2008, while the United States attempted to recover its removal costs from EMC in an affirmative lawsuit filed in June 2008.

### 1. Claim for Reimbursement and Initial Denial (February 2008)

On January 11, 2008, Plaintiffs submitted claims to the NPFC seeking reimbursement of removal costs incurred on behalf of EMC and SWS.[1] In support of

---

[1] As noted, EMC and SWS were also claimants, but for simplicity, the Court refers only to Plaintiffs. (Cmplt. ¶¶ 35, 38).

these claims, Plaintiffs argued that EMC was entitled to full exoneration from liability and recovery of all clean-up and removal costs under 33 U.S.C. § 2703 because the incident was solely caused by acts or omissions of third parties. Alternatively, they argued that EMC was entitled to limited liability of $2,000,000, and hence recovery of removal costs over this amount, under 33 U.S.C. § 2704(a)(1)(B). (*Id.* ¶¶ 35, 36, 38). This limitation of liability applies unless an incident was proximately caused by the gross negligence or willful misconduct of, or a violation of an applicable federal safety, construction or operating regulation by, the responsible party or its agent. 33 U.S.C. § 2704(a)(1). Plaintiffs also maintained that SWS's expenses should be reimbursed because the company was not a "responsible party" under the Act. (*Id.* ¶ 42).

The NPFC denied the claims on February 20, 2008, finding (in part) that EMC was guilty of gross negligence because one of its employees had caused the explosion by using a propane torch near an open standpipe. (*Id.* ¶¶ 43, 45). This decision, however, was based on a non-final draft of the Coast Guard's Report of Investigation, prepared by Lt. Mark Hamilton. (*Id.* ¶ 44). When the NPFC discovered that it had considered a draft report, it rescinded the decision, (*id.* ¶ 46), and "ordered a *de novo* adjudication." (Doc. 21, at 3).

### 2. The United States' Attempt to Recover Removal Costs (2008-2011)

On June 2, 2008, the United States filed suit against EMC in the Northern District of Illinois seeking to recover removal costs it incurred as a result of the oil spill. (Cmplt. ¶ 47). Specifically, the United States argued that EMC was not entitled to limited liability and was instead fully liable for all costs because the explosion resulted from the company's negligence, gross negligence and/or violations of applicable federal safety

regulations (*i.e.*, an EMC employee's alleged use of a propane torch near an open standpipe). (*Id.* ¶¶ 48, 49). While this case was pending, the NPFC held Plaintiffs' claims in abeyance, "contending that the decision on the issue of limitation of liability was central to the litigation, and would be decided by the court." (*Id.* ¶ 53).

After a bench trial, Judge Leinenweber issued a decision on October 13, 2011, finding that the United States had failed to prove that EMC was guilty of gross negligence, willful misconduct or violation of any regulation that caused or contributed to the explosion on the EMC 423 and the resulting oil spill. (*Id.* ¶ 51). The court explained that "[b]ecause the Government has proved neither that a propane torch was being used nor the standpipe was open this Court cannot accept the Government's theory of the cause of the explosion." *United States v. Egan Marine Corp.*, No. 08 C 3160, 2011 WL 8144393, at *3 (N.D. Ill. Oct. 13, 2011). As a result, "the limitation of liability *does* apply in this case, and the Government is not entitled to recover additional funds from EMC." *Id.* at *4 (emphasis in original).

### 3. Second Claim Denial (June 2012)

On June 11, 2012 (about eight months after Judge Leinenweber's ruling), the NPFC denied Plaintiffs' claims for reimbursement of removal costs incurred on behalf of EMC and SWS. (Cmplt. ¶ 55). The NPFC stated that Plaintiffs and their insureds failed to meet their burden of proving by a preponderance of the evidence the actual cause of the explosion, including the source of ignition. As a result, the NPFC said it could not "determine that the claimant has demonstrated entitlement to a limit of liability where exceptions may apply that are dependent on the circumstances of the incident that bear on proximate causation." (Doc. 15-5, at 5-6; Cmplt. ¶ 57). With respect to SWS, the

4

NPFC found that given Mr. Egan's ownership of both EMC and SWS, SWS "ha[d] not established its third party claimant status because there [wa]s evidence that Service Welding may have been an owner or operator at the time of the incident and therefore a responsible party." (Doc. 15-5, at 7; Cmplt. ¶ 61).

Attached to the NPFC's claim denial was an "Appendix A" of "Documentation and Evidence Reviewed and Considered" in reaching the decision. (Doc. 15-5, at 9-19). This appendix included a list of unrelated violations committed by several EMC barges from 1994 through 2004, only one of which pertained to the EMC 423. (*Id.* at 18-19). The appendix also cited to testimony from Lt. Cmdr. Dean Firing of the Coast Guard that EMC did not have a "positive" reputation. (*Id.* at 15). Finally, Appendix A summarized testimony from nearly every deponent in the lawsuit filed by the United States (No. 08 C 3160), but omitted any reference to eyewitness Bobby Griffin, who saw the explosion from the Cicero Avenue Bridge. (*Id.* at 12-17; Doc. 15 ¶ 21). The appendix did cursorily acknowledge the presence of a second eyewitness, William Arrington, but said nothing about his testimony that prior to the explosion, he did not see anyone on the barge, or anyone using a propane torch. (Doc. 15-5, at 14; Doc. 15 ¶ 22).

4.  **Reconsideration and Final Decision by NPFC (September 2012)**

Plaintiffs submitted a timely Request for Reconsideration, and on September 21, 2012, the NPFC issued a new decision agreeing with Plaintiffs' objections to the use of Appendix A. (Cmplt. ¶¶ 65, 66; Doc. 15-8, at 6). Specifically, the NPFC stated:

> [T]o the extent the appendix includes conjecture as to what violations may have occurred if the cause of the explosion had been established, it is irrelevant to the determination. In hindsight, it is an unnecessary appendix and to the extent it has created confusion, it was ill-advised. As Claimants

5

> rightly state, the appendix failed to include a list of all evidence available for review, including the deposition testimony of an eyewitness. In reconsidering the first determination, the NPFC reviewed again all evidence in the record.

(Doc. 15-8, at 6). Nevertheless, after "perform[ing] a *de novo* review of the complete claim submission and the entire record," (*id.* at 4), the NPFC affirmed that Plaintiffs were not entitled to limited liability under the OPA because "the cause of the explosion remains unknown" and "it is fundamental that the cause of an incident must be explained in order to demonstrate entitlement to a limitation of liability." (*Id.* at 5). The NPFC rejected the argument that collateral estoppel required a finding of limited liability based on Judge Leinenweber's ruling given the "differing evidentiary standards, burden of proof, identity of the parties and nature of the relief sought…." (Doc. 21-2, at 5). The agency instead found that the Court had not decided whether Plaintiffs had "demonstrated an entitlement to a limitation of liability" – only that "the Government had failed to prove its theory of the cause of the incident by a preponderance of the evidence, and therefore could not recover costs from [EMC]." (*Id.*).

With respect to SWS, the NPFC reversed its earlier decision denying the claim and granted the company's request for reimbursement. (Cmplt. ¶ 67). The NPFC explained that "new documentation provided by the Claimant establishes that Service Welding, as an entity distinct from Egan Marine, was not an owner or operator of the barge . . . at the time of the incident and is not a responsible party." (Doc. 15-8, at 9).

### 5. Plaintiffs' Lawsuit and Motion to Compel

Plaintiffs filed this lawsuit on December 6, 2012 seeking judicial review of the NPFC's decision pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.* They have now filed a motion to compel arguing that they are entitled to

discovery of several categories of documents because: (1) the administrative record in this case is incomplete; and/or (2) the United States has acted in bad faith in adjudicating their claims. (Doc. 15 ¶¶ 30, 37, 38).[2] Plaintiffs also ask that the United States produce a privilege log listing any documents it has withheld from the administrative record on privilege grounds. (*Id.* ¶¶ 42, 43).

## DISCUSSION

In cases seeking judicial review of an administrative decision, "the focal point . . . should be the administrative record already in existence." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). This record should contain "all documents and materials directly or indirectly considered by the agency" in making the challenged decision. *Miami Nation of Indians of Indiana v. Babbitt*, 979 F. Supp. 771, 777 (N.D. Ind. 1996). Notably, "the agency determines what constitutes the 'whole' administrative record because [i]t is the agency that did the considering, and that therefore is in a position to indicate initially which of the materials were before it – namely, were directly or indirectly considered." *Pacific Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006) (internal quotations omitted). Indeed, "absent clear evidence to the contrary, an agency is entitled to a strong presumption of regularity, that it properly designated the administrative record." *Id.*

---

[2] The requested documents include: (1) internal communications among NPFC personnel; (2) communications between the NPFC and other agencies, including divisions of the Coast Guard; (3) memoranda, notes or summaries contained within the agency file in this matter; (4) drafts of the Coast Guard Investigation Reports and decisions issued in this matter, including comments on such drafts; (5) documents concerning meetings held by the NPFC or other agencies relating to this matter; (6) internal guidelines or policies for adjudicating claims; and (7) any other documents or materials relied upon by the NPFC in any way to reach its decision. (Doc. 15, at 15).

Even though "[d]iscovery is rarely proper in the judicial review of administrative action," exceptions do exist, as "summarized in *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988), amended, 867 F.2d 1244 (1989)." *USA Group Loan Servs., Inc. v. Riley*, 82 F.3d 708, 715 (7th Cir. 1996). These include: (1) "the agency has relied on documents or materials not included in the record," *Animal Defense*, 867 F.2d at 1244; and (2) "plaintiffs make a showing of agency bad faith." *Animal Defense*, 840 F.2d at 1437. To overcome the strong presumption of regularity accorded to an agency, there must be a similarly "strong" or "substantial" showing that one of these exceptions applies. *Amfac Resorts, L.L.C. v. U.S. Dept. of the Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001).

### A. Scope of Administrative Record

Plaintiffs claim that discovery is appropriate in this case because the NPFC relied on information not contained in the administrative record. (Doc. 15 ¶ 39). This argument is based on Plaintiffs' belief that the NPFC withheld from the record "communicat[ions] with other divisions of the Coast Guard regarding the investigation and cause of the explosion." (*Id.*). Plaintiffs do not have specific evidence of such communications, but instead speculate that someone from the NPFC must have spoken with the Coast Guard's Lt. Hamilton because the agency somehow managed to "obtain[] a draft copy of [his] Report of Investigation . . . before the report was even made final." (*Id.*). Plaintiffs also posit that the NPFC communicated with Lt. Cmdr. Firing since the agency's June 11, 2012 decision cited to his deposition testimony regarding EMC's negative reputation. (*Id.*).

The Court is not persuaded that Plaintiffs have made a sufficient showing that the administrative record is missing material considered by the NPFC. As reflected in communications during the meet-and-confer process, the United States explained that the NPFC obtained the draft investigation report not by communicating with Lt. Hamilton, but "as the result of a document-management error within the Coast Guard." (Doc. 21, at 8). The Coast Guard operates a Marine Information and Law Enforcement database from which the NPFC "may draw information regarding a casualty investigation." (*Id.*). A member of the Coast Guard mistakenly uploaded Lt. Hamilton's draft report without final approval from the Commandant, and "[t]he first NPFC adjudicator, believing this draft to be final because it was in the database, used it in his adjudication of the claim." (*Id.*).

Thereafter, Lt. Hamilton was deposed concerning communications with the NPFC. He indicated that he did speak with someone, possibly from the NPFC, but only about a concern that the agency had released the non-final report. (Hamilton Dep., at 192-93). The NPFC later withdrew the decision that was based on the draft report and reviewed Plaintiffs' claim *de novo.* This sequence of events in no way demonstrates that the NPFC communicated with Lt. Hamilton on any topic relevant to that *de novo* review.[3] As for Lt. Cmdr. Firing, Plaintiffs fail to explain how the NPFC's use of his deposition testimony in any way demonstrates that the agency communicated with him. *See Styrene Info. and Research Ctr., Inc. v. Sebelius*, 851 F. Supp. 2d 57, 63 (D.D.C. 2012) ("Conclusory statements will not suffice; rather, the plaintiff must identify reasonable, non-speculative grounds for its belief that the documents were considered

---

[3] Given that the NPFC made its subsequent claim determination without considering the draft report, there is no merit to Plaintiffs' objection that the draft nonetheless constitutes part of the administrative record. (Doc. 15 ¶ 9).

9

by the agency and not included in the record.") (internal quotations omitted). *Compare Miami Nation of Indians of Indiana*, 979 F. Supp. at 777 (finding record incomplete and granting motion for discovery where the United States itself had included "extensive field notes and logs of field interviews, handwritten notes and data, and certain other notes and analyses" in the administrative record, but omitted similar types of drafts and notes sought by the plaintiffs).

In sum, Plaintiffs have not shown that the administrative record in this case is incomplete, and their request that the United States produce documents on that basis is denied.

### B. Bad Faith

Plaintiffs argue that they are also entitled to the requested discovery because the NPFC has handled their claims in bad faith. "Courts have imposed a high standard on plaintiffs seeking to demonstrate bad faith," *Tafas v. Dudas*, 530 F. Supp. 2d 786, 798 (E.D. Va. 2008), and there must be "a reasonable factual basis for [such a] contention." *Apex Constr. Co. v. United States*, 719 F. Supp. 1144, 1147 (D. Mass. 1989). In that regard, "it is well established that naked assertions of bad faith will not suffice to open the door to discovery in an APA action." *New York v. Salazar*, 701 F. Supp. 2d 224, 240 (N.D.N.Y. 2010) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)). At the same time, "[w]hat constitutes a strong preliminary showing of bad faith or improper behavior . . . is a matter that the courts have been reluctant to define, preferring in the main simply to declare that on the facts of a given case, the showing has not, or occasionally has, been made." *Id.* at 241 (quoting *Tummino v. Von Eschenbach*, 427 F. Supp. 2d 212, 230 (E.D.N.Y. 2006)).

Here, Plaintiffs first attempt to demonstrate bad faith through the following procedural history. The NPFC initially denied Plaintiffs' claims based in part on an unapproved draft of the Coast Guard's Report of Investigation, which indicated that the explosion aboard the EMC 423 had been caused by a crew member's use of a propane torch. (Doc. 22, at 4). The NPFC withdrew that decision, but also filed suit against EMC (No. 08 C 3160) arguing that the company was guilty of gross negligence because a crew member had used a propane torch. While that federal case was pending, the NPFC held Plaintiffs' claims in abeyance to await a ruling. When the district court decided in favor of EMC due to insufficient evidence that anyone had used a propane torch, however, the NPFC disregarded that finding and denied Plaintiffs' claims for another reason – namely, their inability to prove the actual cause of the explosion. (*Id.* at 4-5). Plaintiffs maintain that "[t]he United States' refusal to accept the decision [in Case No. 08 C 3160] that EMC is entitled to limitation of liability, and its denial of Plaintiffs' claims after receiving that decision is strong evidence of bad faith on the part of the United States." (*Id.* at 6).

The flaw in Plaintiffs' argument is that no court has yet determined whether the United States was required to apply the findings of Case No. 08 C 3160 to Plaintiffs' claims for reimbursement. Nor has there been any determination regarding the validity of the United States' position that Plaintiffs must show the actual cause of the explosion in order to secure limited liability. The parties clearly have different interpretations of the applicable OPA provisions and the proper standard of review for limited liability claims, and the district judge must decide these issues rather than this Court. In the absence of

such rulings, this Court cannot say that the NPFC's decisions and legal positions are meritless and thus constitute strong evidence of bad faith.

Plaintiffs insist that they have other evidence of bad faith in the form of the NPFC's reliance on irrelevant information in the June 11, 2012 claim denial. (Doc. 15 ¶¶ 19-22; Doc. 22, at 7). There is no dispute that Appendix A to that decision "references a number of matters that have absolutely nothing to do with the cause of the explosion, or Plaintiffs' right to recover on their claims." (Doc. 22, at 7). For example, the appendix includes a list of violations committed by several EMC barges from 1994 through 2004, none of which relates to the January 19, 2005 explosion on the EMC 423 at issue here. The appendix also cites testimony about EMC not having a "positive" reputation, and selectively excludes potentially exculpatory testimony from eyewitnesses to the explosion. (*Id.*). In Plaintiffs' view, this evidence shows that the Coast Guard was prejudiced against EMC, and the NPFC acted in bad faith by "purposely ignor[ing] any evidence that is favorable to Plaintiffs." (Doc. 15 ¶¶ 20, 22).

The problem for Plaintiffs is that the NPFC subsequently conceded that Appendix A was improper and conducted a *de novo* review of the evidence. Plaintiffs may be dissatisfied with the results of that new review but this does not suffice to show bad faith. *Tafas*, 530 F. Supp. 2d at 798 (citing *Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1044 (2d Cir. 1983)) ("Importantly, disagreement with an agency's ultimate decision, or with its interpretation of the factual materials before it, is not bad faith."). If anything, the decision to conduct a *de novo* review rather than ignore the issues raised by Plaintiffs in the Request for Reconsideration suggests the absence of bad faith.

Plaintiffs finally argue that the NPFC's handling of the claim by SWS shows bias and bad faith against Mr. Egan, the owner of both SWS and EMC. Plaintiffs believe that from the outset, they submitted more than enough documentation to establish that SWS is independent from EMC and not a responsible party under the OPA. Yet the NPFC initially denied SWS's claim, noting that: (1) SWS and EMC were insured under the same marine insurance policy; (2) Dennis Egan is the principal of both companies, such that "the lines here are blurred as to what exactly is the relationship between these entities"; and (3) SWS became the managing owner of the M/V LISA E after the January 19, 2005 explosion and clean-up. (Doc. 22, at 8; Doc. 15-5, at 7). Plaintiffs maintain that "[t]he NPFC's reliance on ownership of the LISA E years after the explosion in order to assert that SWS may have been a responsible party at the time of the explosion is suspect at best, and demonstrates that the NPFC would take any position, including a position completely unsupported by the evidence, to justify denying the claims of any company associated with the owner of EMC." (Doc. 22, at 9).

The Court cannot agree that this example constitutes a strong showing of bad faith given that the NPFC subsequently granted and paid SWS's claim on reconsideration. Plaintiffs may believe that their initial documentation sufficed to prove that SWS was not a responsible party, but the fact that the NPFC disagreed with that assessment is not evidence that it was biased against Mr. Egan or his companies. *See, e.g., Ervin & Assocs., Inc. v. Cisneros*, No. 96-2164, 1996 WL 622152, at *2 (D.D.C. Oct. 22, 1996) (denying request for discovery where the plaintiff "has not provided any basis for doubting the good faith of the administrative objective and plan, other than his own allegations and skeptical interpretation of the record.").

Viewing the record as a whole, Plaintiffs have not made a strong showing of bad faith on the part of the NPFC sufficient to justify their request for discovery.

**C.     Privilege Log**

Plaintiffs claim that even in the absence of additional discovery, the United States should be required to provide a privilege log identifying any documents that have been withheld from the record based on the deliberative-process privilege. (Doc. 15 ¶ 42; Doc. 22, at 9). The United States responds that it "has not withheld any documents considered directly or indirectly by the agency decision maker on the basis of privilege," and that the NPFC's "internal deliberations are not a part of the record in the first instance." (Doc. 21, at 14). Plaintiffs do not dispute that "neither the internal deliberative process of the agency nor the mental processes of individual agency members" are proper components of the administrative record. *Portland Audubon Soc'y v. Endangered Species Committee*, 984 F.2d 1534, 1549 (9th Cir. 1993). Nevertheless, Plaintiffs maintain that the United States should be required to list these documents on a privilege log because parties are not required to accept "on faith" that "an unidentified document is privileged and, therefore, not part of the record." (Doc. 22, at 10-11).

In support of this position, Plaintiffs direct the Court to *Black Warrior Riverkeeper, Inc. v. Alabama Dept. of Transp.*, No. 2:11-CV-267-WKW, 2013 U.S. Dist. LEXIS 75766 (M.D. Ala. May 30, 2013), where the plaintiff charged the defendants with "fail[ing] to comply with their statutory duty to prepare an SEIS [supplemental environmental impact statement]" setting forth the effects of a highway project on the local environment. *Id.* at *2-3. The defendants did not dispute that "the administrative record on [such] a failure-

to-act claim cannot 'be limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record.'" *Id.* at *3 (quoting *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000)). Yet the defendants failed to address "just how far the proper scope of the administrative record on a failure-to-act claim extends." *Id.* at *5. As a result, the court instructed that "at the very least, Defendants must compile a record that includes whatever documents are relevant to that claim." *Id.*

The plaintiff in that case asked that the defendants be required to provide a privilege log to "facilitat[e] an assessment of the universe of documents being withheld [and] the validity of Defendants' justifications for withholding." *Id.* (internal quotations omitted). The court trusted that the defendants would not "inappropriately invoke the deliberative-process privilege," but concluded that "asking [the plaintiff] to share the faith would belie the adversarial nature of American-style litigation." *Id.* As the court reasoned, "[a] privilege log is the surest way of holding Defendants to th[eir] burden" of proving that a privilege actually applies. *Id.* at *6.

This case is easily distinguishable from *Black Warrior Riverkeeper* because it does not involve a failure-to-act claim where the scope of the record is unclear. Whereas the defendants in *Black Warrior Riverkeeper* had some discretion in deciding which documents were relevant to the plaintiff's claim and thus part of the record, the United States here faced a certain and defined administrative record, which they produced in its entirety. Several courts have found that in such circumstances, "[t]he law is clear: [since] predecisional and deliberative documents 'are not part of the administrative record to begin with,' . . . they 'do not need to be logged as withheld from

15

the administrative record.'" *Oceana, Inc. v. Locke*, 634 F. Supp. 2d 49, 52 (D.D.C. 2009), rev'd on other grounds, 670 F.3d 1238 (D.C. Cir. 2011) (quoting *National Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Human Servs.*, 631 F. Supp. 2d 23, 27 (D.D.C. 2009)). *See also American Petroleum Tankers Parent, LLC v. United States*, __ F. Supp. 2d __, 2013 WL 3462575, at *8 (D.D.C. July 10, 2013) ("[T]he agency need not provide a privilege log of the documents withheld pursuant to the privilege.").

Plaintiffs disagree with *Oceana*, but the Court finds its holding consistent with the two stated rationales for excluding deliberative documents from the administrative record. First, "judicial review of agency action should be based on an agency's stated justification, not the predecisional process that led up to the final, articulated decision." *Tafas*, 530 F. Supp. 2d at 794 (internal quotations omitted). In addition, "[r]equiring the inclusion of deliberative materials in the administrative record would pressure agencies to conduct internal discussions with judicial review in mind, rendering 'agency proceedings . . . useless both to the agency and to the courts.'" *Id.* (quoting *San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Comm'n*, 789 F.2d 26, 44-45 (D.C. Cir. 1986)). In this Court's view, requiring the United States to identify and describe on a privilege log all of the deliberative documents would invite speculation into an agency's predecisional process and potentially undermine the limited nature of review available under the APA.

Plaintiffs' reliance on *California Native Plant Soc'y v. U.S. Environmental Protection Agency*, 251 F.R.D. 408 (N.D. Cal. 2008), is also misplaced. The court in *California Native Plant Soc'y* had previously granted "limited discovery in order to provide the factual basis required to establish" that a "Conceptual Strategy" for a

development project constituted a "final agency action." 251 F.R.D. at 410. In responding to the plaintiffs' discovery requests, the agencies "claimed the deliberative process privilege for a number of documents," which they identified on privilege logs. *Id.* The court found the logs inadequate, however, and required the agencies to "supplement the[m] with more detailed information as to how the documents fit into the deliberative process." *Id.* at 412-14. *See also Miami Nation of Indians of Indiana*, 979 F. Supp. at 77-778 (where court found administrative record incomplete and ordered additional discovery, the United States had to "specify which materials it contends the deliberative process privilege protects with specificity"). Since this Court has declined to order any additional discovery in this case, and the United States has not withheld any documents from the administrative record, there is no need for a privilege log.

## **CONCLUSION**

For the reasons stated above, Plaintiffs' Motion to Compel Completion of Administrative Record (15) is denied.

ENTER:

Dated: August 23, 2013

*[signature: Sheila Finnegan]*

SHEILA FINNEGAN

17